### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **REVEAL ENERGY SERVICES INC.** <br> **and STATOIL GULF SERVICES LLC** | § <br> § <br> § | |
| **Plaintiffs,** | § <br> § | **CIVIL ACTION NO. _____** |
| **v.** | § <br> § <br> § | |
| **MATTHEW A. DAWSON, JIN Z.** <br> **DAWSON, and AXIOM GENESIS INC.,** | § <br> § <br> § | **JURY DEMAND** |
| **Defendants.** | § <br> § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, Statoil Gulf Services LLC ("Statoil") and Reveal Energy Services Inc. ("Reveal") (collectively "Statoil/Reveal") file this Complaint against Defendants Matthew A. Dawson ("Dawson"), Jin Z. Dawson ("Jin Dawson"), and Axiom Genesis Inc. ("Axiom") (collectively "Defendants"), and allege as follows:

### INTRODUCTION

1.      This is an action for breach of contract for violation of confidentiality obligations, willful and malicious trade secret misappropriation under federal and state law, tortious interference with contractual relations, and breach of fiduciary duty. The plaintiffs Statoil and Reveal are affiliates of an international oil company, Statoil ASA. Reveal was formed in 2016 to commercialize Statoil's breakthrough hydraulic fracking technologies.

2.      The Defendants are:

- **Matthew A. Dawson**: Dawson is a former key Statoil employee, whom Statoil seconded to Reveal to serve as its Chief Technology Officer ("CTO"). Dawson intentionally and

maliciously stole confidential information and trade secrets from Statoil/Reveal and deliberately withheld technical information from them, all in flagrant violation of his contractual and fiduciary obligations to them. Dawson committed these acts of malfeasance for the purpose of furthering a fraudulent scheme, of which Dawson was the architect and principal actor, to set up a competing business utilizing Statoil/Reveal's proprietary technology;

- **Jin Z. Dawson**: Jin Dawson actively participated in the fraudulent scheme devised by her husband to steal Statoil/Reveal's confidential information and trade secrets. In furtherance of that scheme, on information and belief, Jin Dawson filed a patent application falsely in her own name based upon Statoil/Reveal's confidential information and proprietary technology conveyed to her by Dawson in violation of his confidentiality and fiduciary obligations; and

- **Axiom Genesis Inc.**: Axiom is the company recently formed by Dawson, to interfere with Statoil/Reveal's existing contractual relationships and to convert for his own personal benefit Statoil/Reveal's customers and potential customers. Dawson further is using Axiom to disrupt Reveal's outside funding, and to use Statoil/Reveal's technology, confidential information, and trade secrets for his own personal gain.

3.     This fraudulent scheme by the Defendants is actively ongoing, is causing and will continue to cause Statoil/Reveal irreparable harm, and unless enjoined by this Court, Reveal's nascent customer base and its ongoing and active attempts to build its business on the basis of its own proprietary technology are at risk.

4.     The genesis of this fraudulent scheme was Dawson's unsuccessful attempt to extract from Statoil/Reveal an equity interest in Reveal. When that attempt failed, Dawson, while still a

Statoil employee bound by multiple confidentiality and intellectual property agreements, launched a calculated campaign to undermine Reveal's outside funding, to compromise and misappropriate Statoil/Reveal's intellectual property, and to steal their confidential information and trade secrets by, among other things, secretly transferring them to external storage devices that he failed to return to Statoil/Reveal upon his resignation. Dawson is using the stolen confidential information and trade secrets to fuel his ongoing efforts to compete directly against Statoil/Reveal based on their own technology. Moreover, Dawson is actively meeting with Statoil/Reveal's current and potential customers for the purpose of poaching their business and undermining Statoil/Reveal's strong position in the marketplace for Dawson's own personal financial gain. In his solicitations to Reveal's current and potential customers, Dawson is seeking to draw them into the web of his illegal scheme.

5.     This action is brought to bring to a halt to Dawson's illegal scheme, to protect Statoil/Reveal's confidential information and trade secrets, to protect their current and potential customers from misrepresentations by Defendants and to bring them to justice before this Court.

## PARTIES

6.     Plaintiff Statoil Gulf Services LLC is a limited liability corporation formed under the laws of Delaware and doing business at 2107 CityWest Boulevard, Suite 100, Houston, Texas 77042.

7.     Plaintiff Reveal Energy Services Inc. is a Delaware corporation doing business at 2107 CityWest Boulevard, 14th Floor, Houston, Texas 77042.

8.     Defendant Dawson is an individual who resides at 5218 Westwind Court, Sugar Land, Texas 77479.

9.     Defendant Jin Dawson is an individual who resides at 5218 Westwind Court, Sugar Land, Texas 77479.

10.     Defendant Axiom is a Delaware corporation having a principal place of business at 3130 Grants Lake # 18616, Sugar Land, Texas 77496.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 because this action raises claims under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the subject matter of Statoil/Reveal's state law claims pursuant to 28 U.S.C. § 1367 because they arise out of the same operative facts as the federal claims.

12.     This Court has personal jurisdiction over Defendants because they reside in Sugar Land, Texas within this judicial district, because Dawson was employed by Statoil and seconded to Reveal in Houston, Texas, and because Defendants committed and continue to commit their unlawful and tortious acts within this judicial district in Texas.

13.     Venue is proper under at least 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and because the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

**Plaintiffs Statoil and Reveal**

14.     Statoil is a U.S. affiliate of an international energy corporation and was founded in 2005. Statoil performs geophysical, geological, and other exploration services for the oil and gas industry.

15.     On January 25, 2016, Reveal was formed to further develop and commercialize Statoil's breakthrough hydraulic fracturing ("fracking") technologies.

16.     As part of the Reveal spin-off, Statoil entered into two agreements with Reveal.

17.     First, Statoil entered into a Secondment Agreement with Reveal effective on April 18, 2016. The Secondment Agreement identified Dawson as secondee and assigned him the title and responsibilities of CTO of Reveal.

18.     Second, Statoil licensed its IMAGE Frac® technology to Reveal in a "Sole License Agreement" between Statoil and Reveal dated May 23, 2016.

**<u>Dawson's Employment at Statoil</u>**

19.     Statoil employed Dawson from September 2012 until he resigned on January 11, 2017 (effective January 16, 2017).

20.     On August 21, 2012, Statoil offered Dawson a job as "Principal Researcher Hydrocarbons (Reservoir)" in the "Principal Professional career band, in the Technology Projects & Drilling, Research group in Houston, TX."

21.     Dawson accepted Statoil's employment offer on August 26, 2012 and began work as a Principal Researcher soon thereafter.

22.     On March 23, 2015, Statoil offered Dawson a position as Investment Manager within Statoil's Technology Invest organizational unit.

23.     Dawson accepted the Investment Manager position on March 25, 2015 and began work in that role on April 1, 2015.

24.     Dawson continued as an Investment Manager until he was seconded to Reveal on April 18, 2016.

25.     Dawson served as Reveal's CTO until he resigned on January 11, 2017.

26.     Dawson's resignation became effective on January 16, 2017.

27.     While at Statoil, Dawson was named as an inventor on several U.S. patent applications that he assigned to Statoil during his employment with Statoil, including:

- U.S. Patent Application No. 14/582,395 (now U.S. Patent No. 9,512,704), entitled "Methods of producing hydrocarbons from a wellbore utilizing optimized high-pressure water injection," filed on December 24, 2014, and assigned by Dawson to Statoil on December 23, 2014;

- U.S. Patent Application No. 14/582,353, entitled "Methods of producing hydrocarbons from a wellbore utilizing optimized water injection," filed on December 24, 2014, published as U.S. Patent Application Publication No. 2016/0186546, and assigned by Dawson to Statoil on December 29, 2014;

- U.S. Patent Application No. 14/618,865, entitled "Method of acquiring information of hydraulic fracture geometry of evaluating and optimizing well spacing for multi-well pad," filed on February 10, 2015, published as U.S. Patent Application Publication No. 2016/0237799, and assigned by Dawson to Statoil on February 8, 2015;

- U.S. Patent Application No. 14/788,056, entitled "Method of geometric evaluation of hydraulic fractures," filed on June 30, 2015, published as U.S. Patent Application Publication No. 2017/0002652, and assigned by Dawson to Statoil on June 29, 2015.

28.    As set forth below, Dawson, like other Statoil employees, is bound by confidentiality agreements in order to protect Statoil's trade secrets and other confidential information. Dawson reaffirmed his duty to protect confidential information and trade secrets of Statoil/Reveal in 2015 and again in 2016.

**Statoil/Reveal's IMAGE Frac® Technology**

29.    Reveal currently offers a product called IMAGE Frac®, which is used in the fracking industry to map the response of underground rock formations to fracking operations.

30.     As part of the oil and gas development and production process, a given well may be stimulated to extract additional oil and gas by pumping a mixture of fluids into the well. Because the fluid injection occurs under pressure, the fluids exert pressure throughout the adjacent rock formations. Depending on the properties of the surrounding rocks, it is possible that fluid injection into a well can cause a pressure change in an adjacent well.

31.     IMAGE Frac® uses proprietary software to convert pressure measurements from wells that are adjacent to wells undergoing stimulation into a fracture map of the stimulated wells. IMAGE Frac® incorporates both analytical and numerical methods to the analysis of pressure change data in order to create a fracture map, as well as other properties of the surrounding rock formation.

32.     Reveal has used IMAGE Frac® to analyze its customers' oil fields in several states, including Texas, North Dakota and Oklahoma.

33.     Portions of IMAGE Frac®'s analytical and numerical methods are maintained as confidential scientific, technical, and/or engineering trade secrets. During his employment by Statoil and his secondment to Reveal, Dawson specifically acknowledged the need to maintain the confidentiality of the trade secrets relating to IMAGE Frac® in order to protect the value of the product and to preserve Reveal's position in the marketplace.

**Statoil Spins Off Reveal To Commercialize Its IMAGE Frac® Technology**

34.     The technology forming the foundation of IMAGE Frac® was first developed at Statoil.

35.     Dawson was a co-inventor of the IMAGE Frac® technology.

36.     As Reveal's CTO, Dawson was to provide "[t]echnical advisory work including research and development, management of engineering staff, recruitment, client service delivery, industry conference speaker, marketing, and business development."

37.     On July 7, 2016, Dawson acknowledged and accepted his secondment to Reveal.

38.     In addition to seconding Dawson to Reveal, Statoil also licensed its IMAGE Frac®

technology to Reveal in a "Sole License Agreement" (Agreement No. L2696) between Statoil

and Reveal dated May 23, 2016.

39.     Dawson executed the Sole License Agreement on behalf of Reveal.

40.     The Sole License Agreement states that "Statoil has developed and owns new concepts

identified as 'Image Frac™' which represents technology for a potential major improvement in

the ability to evaluate hydraulic fracture geometry while providing insight into proppant

distribution."

41.     The Sole License Agreement further states that "Statoil has decided to invest in a new

spinout company ('Reveal') to further develop and commercialize Image Frac Technology,

through a license agreement between Statoil and Reveal, with the objective to establish a team to

rapidly develop and commercialize the Technology, thereby making the Technology

commercially available to Statoil."

42.     Further, the Sole License Agreement states that "[Reveal] is desirous to further develop,

provide, and supply services based on Statoil's Image Frac Technology. Statoil wants to issue a

License for its concepts or technology as defined herein to Licensee for this purpose."

43.     In the Sole License Agreement, "for a period of five (5) years from the Effective Date,

Statoil grants to [Reveal] a limited, sole license to use the Licensed Technology for development,

manufacture, sale or supply of Licensee Products and Services within the Territory and within

the Field of Use."

44.     Exhibit 1 to the Sole License Agreement identifies certain Patents, Know-How, and

Trademarks as "Licensed Technology."

45.     With respect to "Know-How," the Sole License Agreement states that "[Reveal] has received / will receive documents or access to documents such as specifications, calculations, drawings, methods and procedures, software, source code, test reports, prototypes, trade secrets, user information, and other information and knowledge associated with exploitation of the Licensed Technology, and as listed in this Exhibit 1. The list given below is not an exhaustive overview of Know How. Other information that is provided or to which access is given during the course of negotiations, practical work and other preparations for entering into the agreement, as well as information that will be provided or to which access granted during the period of the agreement is covered in the same manner as the listed Know How, regardless of whether they are indicated in this Exhibit 1."

46.     Exhibit 1 to the Sole License Agreement identifies the Statoil patents, trade secrets, and trademark licensed to Reveal.

**Statoil/Reveal Confidential Information and Trade Secrets**

47.     In addition to the Know-How and other trade secrets Statoil licensed to Reveal, Statoil and Reveal own numerous trade secrets including business plans, investor and customer lists, and internal research and analyses impacting technology development.

48.     Indeed, Statoil and Reveal have expended significant financial and other resources to develop and commercialize IMAGE Frac$^{®}$ and the confidential information and trade secrets related thereto.

49.     Statoil and Reveal have taken all reasonable steps to protect their confidential information and trade secrets, including but not limited to measures to ensure that they are not disclosed or disseminated to third parties, entering into Non-Disclosure agreements where

appropriate, and using employee agreements to safeguard confidential information and trade secrets.

50.     Dawson was intimately involved in preparing the Statoil/Reveal business plans, investor and customer lists, internal research and analyses impacting technology development, and the aforesaid strategic documents related thereto. Dawson is therefore aware of the confidential and trade secret information contained therein.

51.     Dawson also is aware that the IMAGE Frac® code includes confidential trade secrets.

52.     Dawson also is aware of Reveal's intellectual property strategy including its current plans to patent certain technology and preserve other aspects of IMAGE Frac® as confidential trade secrets.

53.     By way of example only, on October 13, 2016, Dawson led a "Reveal IP Strategy Review" to discuss and refine Reveal's plans for protecting its intellectual property.

54.     Approximately two weeks later, Dawson prepared Reveal's Technology Development Pipeline, which includes confidential information and trade secrets.

55.     Two days before his resignation, Dawson emailed his colleagues about "one of the most critical pieces of information that has been left out of publications" which is "something [Reveal] considered as highly proprietary." Dawson further stated that Reveal should "strongly consider keeping this information proprietary and not share[] it with customers." He "strongly recommended [Reveal] never tell customers [about this trade secret]."

56.     Dawson also is aware of ongoing discussions conducted by Reveal with current and potential Reveal customers, the strategy for which is confidential.

**<u>Dawson's Confidentiality, Intellectual Property, and Other Obligations</u>**

57.     Throughout his employment, Dawson repeatedly acknowledged and reaffirmed his duty to protect Statoil/Reveal's confidential information and trade secrets.

-10-

58.    First, by signing his job application, Dawson understood that he was "required to read, familiarize [himself] with, consent to and abide by all Statoil policies, procedures, and standards, including but not limited to, policies regarding confidentiality, inventions, and return of Company property."

59.    Second, Dawson later executed a "Confidentiality Agreement/Intellectual Property" agreement obligating him to "not disclose or use at any time during or after [his employment] any Confidential Information" and "safeguard Confidential Information in [his possession and] protect it against disclosure, misuse, espionage, loss and theft."

60.    In the "Confidentiality Agreement/Intellectual Property" agreement, Dawson acknowledged that "[i]n the event that [he], as part of [his] activities on behalf of [Statoil], generate, author or contribute to any invention, design, new development, device, product, method of process (whether or not patentable or reduced to practice or comprising Confidential Information), any copyrightable work (whether or not comprising Confidential Information) or any other form of Confidential Information relating directly or indirectly to the business of [Statoil] as now or hereinafter conducted (collectively, 'Intellectual Property'), [] such Intellectual Property is the sole and exclusive property of [Statoil]."

61.    By signing the "Confidentiality Agreement/Intellectual Property" agreement, Dawson agreed to "hereby assign all right title and interest in and to such Intellectual Property to [Statoil]."

62.    By signing the "Confidentiality Agreement/Intellectual Property" agreement, Dawson further agreed that "[a]s requested by [Statoil], from time-to-time and upon termination of [his] employment with [Statoil] for any reason, [he] will promptly deliver to [Statoil] all copies and embodiments, in whatever form or medium, materials, records and documents (including

materials maintained electronically) generated by [him] or coming into [his] possession or under [his] control during the course of [his] employment, including but not limited to all Confidential Information or Intellectual Property in [his] possession or within [his] control, written records, notes, photographs, manuals, notebooks, documentation, program listings, flow charts, magnetic media, disks, diskettes, and irrespective of the location or form of such material and, if requested by [Statoil], will provide [Statoil] with written confirmation that all such materials have been delivered to [Statoil]."

63.     Third, when seconded to Reveal as its CTO, Dawson agreed "to endeavor to protect and advance the business interests of [Reveal] during [his] Secondment" and acknowledged that he "shall keep confidential and [] not disclose to [third parties] any Confidential Information of [Reveal] which may be disclosed to [him] or to which [he] may be exposed as a direct or indirect result of [his] Secondment…."

64.     As part of that acknowledgment, Dawson also understood that he "shall keep confidential and [] not disclose to [third parties] any Confidential Information of [Reveal] which may be disclosed to [him] or to which [he] may be exposed as a direct or indirect result of [his] Secondment…."

65.     Further, "[s]ubject to the provisions [] related to intellectual property, [Dawson was to] continue to observe the terms of any intellectual property agreements that [he] may have entered into with [Statoil]."

66.     Dawson expressly acknowledged "that a breach of the confidentiality provisions contained in [the Secondee] Acknowledgement will cause **irreparable harm** to the Party who provided or made available the Confidential Information, and that such harm could not be adequately compensated for in damages alone. [Dawson] agree[d] that the Party who provided or

made available the Confidential Information is entitled to seek equitable relief by way of injunction if there is a breach or a threat of a breach of any of the confidentiality provisions of this Acknowledgement." (Emphasis added).

67.     Dawson "further agree[d] that any inventions, discoveries, improvements, or ideas either conceived or made by [him] during [his] Secondment which [were] based on information, data, or knowledge resulting from [his] Secondment to [Reveal], whether patented, copyrighted or otherwise protected during [his] Secondment or thereafter, will be owned not by [him], but pursuant to Section 14.6 of the Agreement by [Statoil] or [Reveal]."

68.     In the Secondee Acknowledgment, Dawson further "agree[d] to disclose promptly and in writing to [Reveal] the details of such inventions, discoveries, and ideas. [He] also agree[d] to assign (and execute the necessary documents to effect such assignment) to any assignee or assignees designated by [Statoil] or [Reveal] all of [his] right, title, and interest in such inventions, discoveries, and ideas, including any right to secure a patent or copyright on them and any right to use and to enjoy them without further payment to [him] other than the compensation being paid by [Statoil]."

69.     Dawson "further agree[d] not to disclose to third parties any information pertinent to any such inventions, discoveries, improvements, or ideas without the consent of [Statoil] or [Reveal]."

70.     Dawson also "agree[d] that [his] obligations regarding Confidential Information of [Reveal] and its Affiliates survive [his] Secondment."

71.     The Secondment Agreement also included a "Return of Property" provision whereby Dawson agreed that "[a]t the end of his Secondment, [he] shall return to [Reveal] all property,

equipment, materials, Records, and documents in [his] possession which are associated with [his] Secondment."

**Dawson Misappropriated Trade Secrets and Breached Confidentiality Obligations**

72.     Shortly after Dawson acknowledged his Secondment, he devised a scheme to squeeze equity ownership from Reveal or take the technology to a new company where he would use Statoil/Reveal's stolen confidential information and trade secrets to compete against them. A centerpiece of Dawson's scheme was claiming Statoil/Reveal's intellectual property as his own.

73.     On information and belief, Dawson developed an invention relating to proppant mapping while employed by Statoil. When pressed to disclose the particulars of the proppant mapping technology by several Reveal employees, Dawson refused, providing only non-specific information.

74.     In furtherance of Dawson's scheme, his spouse, Jin Dawson, filed a patent application related to proppant mapping in her own name that, on information and belief, included Statoil/Reveal's confidential information and trade secrets.

75.     On information and belief, Dawson disclosed Statoil/Reveal's sensitive, confidential, and trade secret information to Jin Dawson to enable her to file the proppant mapping patent application in her own name.

76.     Dawson then attempted to negotiate terms of his employment at Reveal using the patent application filed by Jin Dawson as leverage. Dawson informed Reveal that he would assist in the preparation of a patent application on proppant mapping on Reveal's behalf if Dawson was given an equity stake in Reveal. Dawson informed Reveal that he would have Jin Dawson's patent application assigned to Reveal if Dawson and Reveal could reach agreement on his equity stake in Reveal and other employment terms.

77.     After Reveal refused to accept Dawson's equity demands and his attempt to hold Reveal hostage by the filing of a patent application on its technology filed by Jin Dawson, Dawson took steps to leave Statoil and use Statoil/Reveal's stolen confidential information and trade secrets to set up a competing business for his personal financial benefit.

78.     On information and belief, Dawson also began exporting Statoil/Reveal's confidential documents and information from Statoil/Reveal's computer networks onto numerous external hard drives still in Dawson's possession as of the date of the filing of this Complaint.

79.     To enable these improper exports, Dawson took advantage of his special permission from Statoil to connect USB devices to his Statoil computer.

80.     While seconded to Reveal, Dawson connected more than a dozen external storage devices to the USB port on his Statoil computer.

81.     At least one of these external storage devices included numerous file folders with names that correspond to file folders maintained on Statoil's computer network and/or Dawson's Statoil computer.

82.     Specifically, Statoil's computer network includes file folders having file paths "F:\Statoil Documents\STI\RE\IP\IP Critical\" and "F:\Statoil Documents\STI\RE\IP\Transferred files\".

83.     One of Dawson's external storage devices includes file folders having strikingly similar file paths "E:\Statoil\Reveal Energy Services\IP\IP Critical\ and "E:\Statoil\Reveal Energy Services\IP\Transferred files\".

84.     On January 2, 2014, Dawson accessed the "F:\Statoil Documents\STI\RE\IP\Transferred files\" file folder on Statoil's computer network. Twenty seconds later, Dawson accessed the "E:\Statoil\Reveal Energy Services\IP\Transferred files\" file folder on his external storage device. On information and belief, this was done so that Dawson could transfer files between the

"F:\Statoil Documents\STI\RE\IP\Transferred files\" file folder on Statoil's computer to the and the "E:\Statoil\Reveal Energy Services\IP\Transferred files\" file folder on his external storage device.

85.     Dawson's external storage devices also include a file folder having a file path "E:\Statoil\IMAGEFrac_Code\". On information and belief, this file folder on Dawson's external storage device likely contains IMAGE Frac® code files.

86.     On January 11, 2017, Dawson submitted his notice of resignation from Statoil and from his secondment to Reveal. Dawson's resignation from Reveal and Statoil was to be effective on January 16, 2017.

87.     Following his resignation, on information and belief, Dawson transferred Reveal's confidential and proprietary technology and business planning files from his Statoil computer and Statoil computer networks to external devices for the purpose of using them to establish and promote Axiom's business. Dawson further deleted files from his Statoil computer through January 13, 2017, the day that Dawson turned in that computer. At no time did Dawson return the aforementioned external storage devices which contain, on information and belief, confidential, proprietary and trade secret information of Statoil/Reveal.

88.     Specifically, Dawson failed to return, as he was contractually bound to do, any of the more than dozen external storage devices he connected to the USB port on his Statoil computer while seconded to Reveal.

89.     Indeed, on January 12, 2017, Dawson connected a Western Digital 2500BEV External USB device to his Statoil computer.

90.     The following day, on January 13, 2017, two days after submitting his resignation, Dawson connected a Seagate FreeAgent GoFlex USB device to his Statoil computer.

91.     On information and belief, Dawson connected the aforementioned external drives to his Statoil computer after his resignation for the sole purpose of transferring Statoil/Reveal confidential, proprietary, and trade secret files onto the external drives for later use by his company Axiom.

92.     Following his resignation from Statoil, Dawson also began contacting potential customers identified in Reveal's confidential trade secret business plan.

93.     On information and belief, Dawson led a "lunch and learn" session on February 8, 2017 at one of Reveal's prospective customers, Pioneer Natural Resources, to discuss his new company, Axiom, and the technology that he claimed his new company would provide to its customers.

94.     The February 8, 2017 lunch and learn session was scheduled by Dawson while he still was CTO of Reveal.

95.     On February 9, 2017, Dawson gave a presentation about Axiom and its technology offerings at an Altira conference in Midland, Texas.

96.     On February 9, 2017, Dawson also moderated a Society of Petroleum Engineers Entrepreneurship Cell Panel Session where he was introduced as having "started an exciting start up called Axiom which helps operators map hydraulic fractures and understand stress shadows with minimal impact to operations and minimal cost."

97.     At that Society of Petroleum Engineers Entrepreneurship Cell Panel Session, Dawson claimed that he started Axiom believing there will be no recourse with Statoil/Reveal. Dawson further claimed that Axiom advantageously combines Reveal's IMAGE Frac® with the Reveal technology he improperly included in the patent application filed by Jin Dawson.

-17-

98.    On information and belief, Dawson is falsely asserting to Reveal's potential customers that he is the owner of the intellectual property for IMAGE Frac®.

99.    On information and belief, Dawson is further communicating to Reveal's potential customers that Axiom can provide the same services provided by Reveal's IMAGE Frac® at a lower cost than Reveal charges its customers.

## COUNT I – BREACH OF CONTRACT
## (DEFENDANT MATTHEW A. DAWSON)

100.    Statoil/Reveal reallege and incorporate the preceding paragraphs as if fully set forth herein.

101.    Defendant Dawson entered into and was legally bound to comply with several confidentiality and intellectual property agreements during his tenure with Statoil and his secondment to Reveal in 2016.

102.    Those confidentiality and intellectual property agreements included the Secondment Agreement between Reveal and Statoil dated April 18, 2016, which included an Exhibit B-Form of Secondee Acknowledgement signed by Dawson on July 7, 2016 (the "Secondment Agreement") and the Confidentiality Agreement/Intellectual Property Agreement executed by Dawson on September 30, 2015 (the "2015 Agreement").

103.    As set forth above, the Secondment Agreement and the 2015 Agreement (collectively the "Confidentiality Agreements") required Dawson to protect and not to disclose or to use after his period of employment, any and all confidential information of Statoil/Reveal, including but not limited to confidential information developed by Dawson himself during his employment and secondment and Statoil/Reveal trade secrets developed by Dawson during said employment or by other employees of Statoil/Reveal during their employment.

-18-

104.    The Confidentiality Agreements, individually and collectively, impose upon Dawson the burden of protecting Statoil/Reveal's confidential information and trade secrets both during and after his employment with Statoil and his secondment to Reveal. They further provide, individually and collectively that all inventions and discoveries made by Dawson during the course of his employment and secondment would be owned by Statoil/Reveal.

105.    In violation of the Confidentiality Agreements, and with the express purpose of damaging Statoil/Reveal and promoting his own personal financial interests, Dawson intentionally breached and continues to violate his confidentiality and intellectual property contractual obligations both during his employment and secondment and after his resignation on January 11, 2017.

106.    Specifically, Dawson conveyed confidential information and trade secrets owned by Statoil/Reveal to Jin Dawson for the purpose of filing a patent application in her own name, based upon inventions, trade secrets and confidential information owned by Statoil/Reveal. Dawson committed these acts in violation of the Confidential Agreements with the express purpose of furthering the scheme to use Statoil/Reveal's confidential information and trade secrets for his own personal advantage. Such actions were also taken by Dawson and for the further benefit of Axiom so that it could interfere with Statoil/Reveal's customer relationships and usurp business opportunities of Statoil/Reveal using its own confidential information, trade secrets and proprietary technology.

107.    In addition, Dawson breached the Confidentiality Agreements by using external storage devices to create file folders that corresponded to file folders on Statoil's computer network which contained files comprising confidential information and trade secrets. On information and belief, Dawson downloaded those files onto the external storage devices for the purpose of

furthering his illegal scheme to steal Statoil/Reveal's confidential and trade secret information for his own personal benefit and that of his company Axiom, all in violation of the Confidentiality Agreements and with the express intent of misappropriating, compromising and destroying Statoil/Reveal's intellectual property.

108.    Furthermore, Dawson breached the Confidentiality Agreements by failing to disclose to Statoil/Reveal certain inventions made during the course of his employment and secondment which were later disclosed to Jin Dawson and included in a patent application filed on her behalf in furtherance of the aforesaid scheme.

109.    Dawson further violated the Confidentiality Agreements by failing to return property belonging to Statoil and Reveal that contained confidential, trade secret, and intellectual property, including numerous external storage devices, as he was contractually obligated to do.

110.    As a result of the foregoing acts, Dawson has breached the Confidentiality Agreements and caused irreparable harm to Statoil/Reveal, which irreparable harm Dawson has admitted to in connection with any violation of the Confidentiality Agreements.

111.    Dawson's breach of the Confidentiality Agreements and the irreparable harm thereby caused to Statoil/Reveal warrant preliminary and permanent injunctive relief. Statoil/Reveal has no adequate remedy at law for these contractual violations and the irreparable harm thereby caused to Statoil/Reveal.

### COUNT II – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT (ALL DEFENDANTS)

112.    Statoil/Reveal reallege and incorporate the preceding paragraphs as if fully set forth herein.

113.    This cause of action arises under the Defend Trade Secrets Acts ("DTSA"), 18 U.S.C. § 1836(b), which established under federal law a private cause of action for trade secret

misappropriation for products and services used in, or intended for use in, interstate and foreign commerce. 18 U.S.C. § 1836(b)(1).

114.    Statoil/Reveal's claim under the DTSA is based upon trade secret misappropriation for products and services used in, or intended for use in, interstate and foreign commerce, namely, for trade secrets related to IMAGE Frac®.

115.    Specifically, the trade secrets that are the subject of this claim under the DTSA are those that Dawson was aware of and are described above in paragraphs 47-56 (the "Trade Secrets").

116.    Statoil/Reveal's Trade Secrets comprise scientific, technical, engineering, and other confidential business information that derives independent value from not being known to or readily accessible by the public using proper means. According to Dawson himself, while he was an employee of Statoil and on secondment to Reveal, this information is secret and proprietary and, if disclosed, would allow customers and competitors to carry out some or all of the functions of IMAGE Frac® without the need to use that product and would effectively destroy the market for IMAGE Frac®.

117.    Statoil/Reveal are the owners of the Trade Secrets and have taken reasonable steps to keep them secret. Dawson has specifically acknowledged that the Trade Secrets are proprietary to and owned by Statoil/Reveal.

118.    Dawson acquired knowledge of the Trade Secrets under circumstances giving rise to a duty to maintain them as trade secrets. Moreover, Dawson himself created and contributed to some of the Trade Secrets during his employment with Statoil and secondment to Reveal.

119.    Dawson, acting in concert with Jin Dawson and Axiom and for Dawson's own personal gain, willfully and maliciously misappropriated Statoil/Reveal's Trade Secrets by using them without Statoil/Reveal's express or implied consent on or after May 11, 2016.

120.    Dawson used improper means to acquire knowledge of the Trade Secrets by misrepresenting his intention to use them for his own personal gain and, on information and belief, by stealing them via use of external storage devices connected to his Statoil computer. Dawson further used improper means to acquire knowledge of Statoil/Reveal's Trade Secrets by breaching his contractual duty to maintain the confidentiality of Trade Secrets and by falsely inducing Statoil/Reveal to entrust him with access to and development of the Trade Secrets.

121.    Jin Dawson used improper means to acquire knowledge of the Trade Secrets by aiding and abetting Dawson in the theft of the Trade Secrets with the knowledge that they were owned by Statoil/Reveal. Jin Dawson further used improper means to acquire knowledge of the Trade Secrets by aiding and abetting Mr. Dawson in his breach of his obligation to maintain the secrecy of the Statoil/Reveal Trade Secrets in connection with the preparation and filing of a patent application in her name.

122.    At the time of the aforementioned disclosure and use of Statoil/Reveal's Trade Secrets, Dawson, Jin Dawson, and Axiom, knew or had reason to know that the knowledge of those Trade Secrets was acquired under circumstances giving rise to a duty to maintain their secrecy.

123.    The aforementioned misappropriation of Statoil/Reveal's Trade Secrets by Defendants for Dawson's own personal financial gain and for the further benefit of Axiom was willful and malicious.

124.    Defendants' misappropriation of Statoil/Reveal's Trade Secrets has caused irreparable harm to Statoil/Reveal, and such harm cannot be adequately compensated for in damages alone.

125.    Plaintiffs seek equitable relief in the form of a preliminary and permanent injunction.

**COUNT III – MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE
TEXAS UNIFORM TRADE SECRETS ACT
(ALL DEFENDANTS)**

126.     Plaintiffs reallege and incorporate the preceding paragraphs as if fully set forth herein.

127.     This cause of action arises under the Texas Uniform Trade Secrets Act ("TUTSA"),
which provides for a private cause of action for trade secret misappropriation. Tex. Civ. Prac. &
Rem. Code § 134A.001 *et seq.*

128.     Defendants misappropriated Statoil/Reveal's Trade Secrets as set forth above for the
express purpose of personally enriching themselves and for the purpose of providing Axiom with
stolen Trade Secrets upon which Axiom would compete directly with Reveal.

129.     Defendants' misappropriation of Statoil/Reveal's Trade Secrets was willful and malicious
under the TUTSA.

130.     Defendants' misappropriation of Statoil/Reveal's Trade Secrets has caused irreparable
harm to Statoil/Reveal, and such harm cannot be adequately compensated for in damages alone.

131.     Statoil/Reveal seek equitable relief under the TUTSA in the form of a preliminary and
permanent injunction.

**COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
(ALL DEFENDANTS)**

132.     Statoil/Reveal reallege and incorporate the preceding paragraphs as if fully set forth
herein.

133.     The aforementioned acts by the Defendants were deliberately intended to interfere with,
damage, disrupt and usurp ongoing contractual relationships that Reveal has with Devon Energy
Production Company, L.P. ("Devon") and with Statoil.

134.    The aforementioned acts by the Defendants have had the intended effect of interfering with, damaging, disrupting and potentially usurping ongoing contractual relationships that Reveal has with Devon and with Statoil.

135.    As a result of Defendants wanton, willful and malicious acts of tortious interference with Reveal's customers, Reveal has suffered irreparable harm that can only be remedied by issuance of a preliminary and permanent injunction against Defendants and all those acting in concert with them.

### COUNT V – BREACH OF FIDUCIARY DUTY
### (DEFENDANT MATTHEW A. DAWSON)

136.    Statoil/Reveal reallege and incorporate the preceding paragraphs as if fully set forth herein.

137.    Dawson's contractual relationships with Statoil and his acknowledgement of the Secondment Agreement with Reveal, as fully set forth in detail above, gave rise to a fiduciary duty on his part to protect and preserve the confidential information and trade secrets of Statoil/Reveal.

138.    Dawson's position as CTO of Reveal and his contractual relationships with Statoil, as fully set forth above, gave rise to a fiduciary duty on his part not to steal Statoil/Reveal's confidential information and trade secrets for the purpose of unfairly competing against Reveal via a new company set up by Dawson for that purpose.

139.    Dawson's contractual relationships with Statoil and his acknowledgement of the Secondment Agreement with Reveal, as fully set forth above, gave rise to a fiduciary duty on the part of Dawson to divulge all inventions made and know-how developed during the course of said employment and secondment to Statoil/Reveal.

140.    Dawson's contractual relationships with Statoil and his acknowledgement of the Secondment Agreement with Reveal, as fully set forth above, gave rise to a fiduciary duty on the part of Dawson to act in the best interests of Statoil/Reveal.

141.    For all the reasons enumerated above, Dawson breached his fiduciary duties to Statoil/Reveal.

142.    Dawson's breach of his fiduciary duties was wanton, willful and malicious and was specifically intended to harm Statoil/Reveal and to enrich himself personally.

143.    Dawson's wanton, willful and malicious breach of his fiduciary duties to Statoil/Reveal have in fact caused, and unless enjoined will continue to cause, irreparable harm to Statoil and result in unlawful personal benefit to Dawson.

## PRAYER FOR RELIEF

WHEREFORE, as result of Defendants' wrongful actions, Statoil/Reveal requests that this Court enter judgment in their favor and against Defendants on the above-recited counts and award Plaintiffs:

    A.  A preliminary and permanent injunction that:

        i.    Requires all Defendants to cease and desist from any disclosure and use of confidential information and trade secrets owned by Statoil/Reveal;

        ii.    Requires Dawson to return all to Statoil/Reveal all confidential and trade secret information of Statoil/Reveal in his possession, custody, or control, including but not limited to external storage drives which contain such information;

        iii.    Requires Dawson to disclose in confidence to Plaintiffs in writing all undisclosed inventions, discoveries, improvements, or ideas either

conceived of or made by Dawson while employed by Statoil or seconded to Reveal;

    iv.    Requires Dawson, Jin Dawson, and Axiom as appropriate, to assign (and execute the necessary documents to effect such assignment) to Reveal all right, title, and interest to any inventions, discoveries, improvements, or ideas either conceived of or made by Dawson, including but not limited to any United States or foreign patent application filed by Jin Dawson or agents acting on her behalf and/or behalf of Dawson, based upon, incorporating or derived from confidential information owned by Statoil/Reveal and provided by Dawson to Jin Dawson while Dawson was employed by Statoil or seconded to Reveal;

    v.    Prevents Dawson, Jin Dawson, or Axiom, and any agent acting on behalf of one or more of them, from filing or prosecuting any United States or foreign patent applications based upon, incorporating or derived from Statoil/Reveal's confidential information or Trade Secrets; and

    vi.    Prevents Defendants from disclosing, using and communicating with any customer or potential customer of Statoil/Reveal based in whole or in part upon Statoil/Reveal's confidential information or Trade Secrets;

B.  An award of compensatory damages sufficient to compensate Plaintiffs for the harm derived from unlawful actions described above.

C.  An award of exemplary damages under the DTSA, TUTSA, and for tortious interference with contractual relations, and breach of fiduciary duty under Texas law;

D. Attorneys' fees and costs as permitted by law, including but not limited to under section 38.001 of the Texas Civil Practice and Remedies Code, TUTSA, and the DTSA; and

E. Any and all further relief this Court deems just and proper.

Respectfully submitted,

*/s/ Edward F. Fernandes*
Edward F. Fernandes
Attorney-in-charge
Texas State Bar No. 06932700
Southern District Bar No. 2638
Email: efernandes@hunton.com
Hunton & Williams LLP
Bank of America Center, Suite 4545
700 Louisiana Street
Houston, TX 77002
Telephone: (713) 229-5700
Facsimile: (713) 229-5750

Charles D. Ossola
Admission *pro hac vice* pending
Email: cossola@hunton.com
Ryan A. Shores
Admission *pro hac vice* pending
Email: rshores@hunton.com
Daniel G. Vivarelli, Jr.
Admission *pro hac vice* pending
Email: dvivarelli@hunton.com
Hunton & Williams LLP
2200 Pennsylvania Ave NW
Washington, DC 20037
Telephone: (202) 955-1500
Facsimile: (202) 778-2201